**Pedro Camacho LOPEZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 35267.**

Court of Criminal Appeals of Texas.

March 13, 1963.

Rehearing Denied April 24, 1963.

———◆———

Joseph Chacon, San Antonio, for appellant.

James E. Barlow, Dist. Atty., San Antonio, and Leon B. Douglas, State's Atty., Austin, for the State.

BELCHER, Commissioner.

The conviction is for murder; the punishment, life.

Antonio and Ramona Lozano, husband and wife, were the parents of five children. On Friday night, August 25, the eldest child, Velma, a girl age 9 and three of the other children slept in two beds in a large room in the house, and the youngest slept in another room with the parents. The family always left the light burning in the kitchen. The mother was awakened by her baby about 2 a. m. and when she went to the kitchen to prepare her baby a bottle she saw the appellant leaving and he turned around twice as he ran. She called her husband because she thought the appellant had stolen something. During the search they found Velma lying on her back on the bed dead. There were two street lights near the Lozano home. Immediately after she saw appellant running she went to the back porch and called her neighbor and told her that a man wearing khaki pants and a red shirt had killed her daughter. Both Mr. and Mrs. Lozano identified the appellant at the trial as the same person they saw in front of their house immediately before they found Velma dead.

Dionicio Rosales testified that she was a neighbor of Lozanos' and she heard Mrs. Lozano scream about 2:30 a. m., Saturday, August 26; and that between 9 and 10 a. m. the same morning she saw the appellant wearing khaki pants and a red shirt walking along the street in front of the Lozano home.

Dr. Hausman, a pathologist, and the Bexar County Medical Examiner, testified that upon his arrival about 3:30 a. m., August 26, at the Lozano home he found blood splotches on a pillow case and a bed sheet which he took into his possession; that he made an external examination of the body of Velma Lozano and later an autospy. He testified that there were fresh lacerations at the opening and deep inside the vagina and marks on the nipples, and that her death was caused by suffocation which could have been done by the use of a pillow, and that she died about 2 a. m. that morning. The deceased had a blood type of "O" RH positive. An analysis of the spots on the sheet showed that they were of human blood.

Detective Foresman testified that immediately after the killing was reported he went to the Lozano home; that the body of the deceased was lying on the bed with the head at the foot of the bed; that at 2:27 a. m., August 26, he lifted some fingerprints from the foot of the bed in which the deceased had been sleeping. The fingerprints of the appellant were taken on September 2 and these known prints were introduced into evidence. Testimony was offered that a comparison of the fingerprints lifted from the bed and the known fingerprints taken from the appellant were identical.

The written statement of the appellant was introduced in evidence and it in part recites that he cashed his pay check after 5 p. m., Friday, August 25, and began drinking beer as he visited numerous taverns until mid-night when he started walking home,

"I walked West on Commerce St. * * * I remember that I looked in the window of some homes on Travis St. I do not know why I was doing this. I do not know or remember if I saw anyone inside of these homes at this time. I continued walking west on Travis st until I reached Picoso St where I turned right going north on Picoso. I went to a house in that first block on Picoso north of Travis St on the left side of the street. The house has a fence and a gate at the sidewalk leading up to the front door. I went thru the front gate and I walked up on the front porch where I looked thru a window and I saw a man and his wife alseep in a bed. I then walked around the back of the house where I found the back door open. There was a light on in the kitchen. I opened the door and walked in to a small porch.

There is another door which was also open leading into the kitchen. I went into the kitchen and I could see the front room and I remember that I could also see a bed in one of the other rooms. I then went into this room where the bed was and I found two children and a girl asleep in one bed. I don't remember if there was another bed in the room or not. * * * I do remember seeing this older girl with two other children in a bed. I do not remember what happened next or what I did to the girl. I remember that I was leaving the house, I think that I was still in the kitchen when I heard a noise in the house and I went on out the back door. I then went around the front and out the front gate of the yard. Just as I was going out the front gate I heard a voice yell and I believed that they were yelling at me but I did not stop and I went north on Picoso to the first corner where I turned right and I went east on this street, I believe it is Salinas, and I then turned north on Hamilton St and went North on Hamilton st to Martin st where I turned left or west on Martin to my home. * * * That morning at about 8:00 or 9:00 A M I heard the newscast on the radio saying that a little girl had been killed and raped on Picoso street. It gave the address. I thought about it that day and I wondered about it. I listened for the news again and when I heard the address again I realized that it was the same house that I had been in the night before. I listened for all the news and I heard that they were looking for a man in a red shirt and khaki pants. I knew that I had worn a red shirt and khaki pants that evening in fact I had put them back on the same Saterday that I was listening to the newscast. * * * I had realized that I had been the one who had killed the little girl."

The appellant testifying in his own behalf denied the commission of the offense and repudiated his confession; and stated that after he had returned home on the morning of August 26th, Officer Moreno came and asked what kind of clothing he had on a few minutes before and he told him khaki pants and a red shirt. After examining the pants and shirt the officer advised him not to wear them for sometime and left. On September 2, about 10 a. m., Officers Fuentes and De La Garza arrested him at his home, took him to the police station and questioned him until about 9:50 p. m., then placed appellant in jail. The next day Officer De La Garza and Holts took the appellant to Austin and returned about 4:30 p. m. He further testified that they then took him to the investigative office where they beat and abused him until he signed a statement. During this time he said he had nothing to eat, no sleep and that he was tired and exhausted.

Ernesta Briones testified that she had been living with the appellant for about six years; that he had been drinking when he came home about 1:15 a. m., August 26, but he was not drunk, and in a few minutes he was asleep.

In rebuttal the state called as a witness each person mentioned by the appellant in his testimony pertaining to the obtaining of the written statement introduced in evidence by the state, and each witness contradicted the testimony of the appellant that he was beaten or abused until he signed the statement.

The issue of the voluntary nature of the written statement was properly submitted to the jury.

█ Appellant contends that the admission in evidence of his written statement was reversible error on the ground that it constituted a denial of due process of law guaranteed to him under the Fourteenth Amendment to the Constitution of the United States.

█ The use in evidence of an involuntary confession against one charged with crime constitutes a denial of due process

which may be determined by an independent examination of and from the undisputed facts. Golemon v. State, 157 Tex.Cr.R. 534, 247 S.W.2d 119.

Appellant contends in his brief that the following undisputed facts show that he involuntarily signed the written statement introduced in evidence by the state: that he could not read or adequately express himself in English; that he was arrested without a warrant at 10 a. m., Saturday, September 2; that he was investigated for an offense other than the one charged in this case and when arrested he was taken to the purported scene of the other crime; that he was handcuffed while the police car was parked under a bridge and then taken to the police station where several officers questioned him alternately until 9:50 p. m., and that he was denied a hearing before a magistrate. About 8 a. m., September 3, two officers took him to Austin and returned about 4:30 p. m., the same day. After his return from Austin, he was taken to the investigative office where he was continuously questioned until he signed the written statement about 3 a. m., September 5. During this time he said he had nothing to eat, no sleep and he was tired and exhausted.

The record reveals the following: while the appellant could not speak or read the English language, he was interrogated by Rudy A. Garza, investigator for the District Attorney's office, who gave the appellant the statutory warning and the statements of appellant were reduced to writing and signed by him. The statement was introduced into evidence and no objections were interposed based upon appellant's inability to speak, read or write English. Mr. Garza testified that he is of Mexican descent, had a B.B.A. degree, and speaks, reads and writes both English and Spanish, and was experienced in translating from one to the other, and that he translated the statement in Spanish to the appellant before he signed it.

The record fails to show that the appellant was arrested without a warrant, or was not immediately taken before a magistrate, but it shows that he was "booked" at the Police Department about 2:30 p. m., September 2. There is no evidence that he was ever denied a hearing before a magistrate, however, the evidence on the hearing of the motion for new trial shows that an examining trial was held. There is no evidence that he at any time requested counsel, a priest or relatives, or if they were notified, but Ernesta Briones was present at 10 a. m. when he was taken into custody at their home. While testifying on the main trial he made no complaint of any mistreatment during the trip to Austin.

From the record as presented, it is concluded that the written statement of the appellant is not shown to have been illegally obtained from him in violation of the due process clause of the Fourteenth Amendment of the United States Constitution and that the same was inadmissible in evidence as a matter of law. McHenry v. State, 163 Tex.Cr.R. 436, 293 S.W.2d 773; Lopez v. State, 171 Tex.Cr.R. 552; 352 S.W.2d 106; Collins v. State, 171 Tex.Cr.R. 585, 352 S.W.2d 841; Fernandez v. State, Tex.Cr. App., 353 S.W.2d 434; Marrufo v. State, Tex.Cr.App., 357 S.W.2d 761.

█ It is contended that the trial court erred in overruling his motion for a new trial based upon newly discovered evidence.

The original motion for new trial was not sworn to, the first amended motion was sworn to by the appellant before his attorney with an attached affidavit of the allegedly newly discovered evidence. Thereafter a second amended motion was filed which was not sworn to and did not have attached any affidavit. The second motion not being properly verified is insufficient to present for review the claim of error in the overruling of the motion on the ground of newly discovered evidence. Cartwright v. State, 158 Tex.Cr.R. 344, 255 S.W.2d 878; Barnett v. State, 160 Tex.Cr.R. 622, 273 S.W.2d 878; Oliff v. State, 161 Tex.Cr.

R. 336, 276 S.W.2d 839; Howard v. State, 165 Tex.Cr.R. 466, 308 S.W.2d 45; Thomas v. State, 166 Tex.Cr.R. 584, 316 S.W.2d 741; Martin v. State, 169 Tex.Cr.R. 423, 334 S.W.2d 796.

 The evidence is sufficient to support the conviction, and, no error appearing, the judgment is affirmed.

Opinion approved by the Court.